UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARK GORDON, an individual,

       Plaintiff,

v.                                              Case No:  2:11-cv-576-FtM-29DNF

FEDERAL EXPRESS CORPORATION, a
Tennessee for-profit corporation also known
as FedEx, and AETNA LIFE INSURANCE
COMPANY, a Connecticut for-profit
corporation,

       Defendants.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause is before the Court on review of Plaintiff's Dispositive Motion for Summary
Judgment (Doc. 79), Plaintiff's sealed Dispositive Motion for Summary Judgment (Doc. 84),
Defendants' Response to Plaintiff's Dispositive Motion for Summary Judgment (Doc. 85),
Defendants' Motion for Summary Judgment (Doc. 78), and Plaintiff's Response in Opposition
to Defendants' Motion for Summary Judgment (Doc. 86).  For the reasons explained below, the
Court respectfully recommends that Defendants' Motion for Summary Judgment (Doc. 78) be
**GRANTED** and Plaintiff's Dispositive Motion for Summary Judgment (Doc. 79) and sealed
Dispositive Motion for Summary Judgment (Doc. 84) be **DENIED**.

      **I.**        **Background**

This is an action brought pursuant to the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiff alleges that Defendants Federal Express
Corporation ("FedEx") and Aetna Life Insurance Company ("Aetna") wrongfully terminated his

long term disability benefits under FedEx's Long Term Disability Plan (the "LTD Plan").  Under the LTD Plan, "disability" is defined as either an "Occupational Disability" or "Total Disability," which "is substantiated by significant objective findings." (AR 286) [1].  "Significant objective findings" are defined as signs noted on a test or medical exam and which are observable and "[c]onsidered significant anatomical, physiological or psychological abnormalities." (AR 279-80).  The "Occupational Disability" term is twenty-four months.  After the twenty-four month Occupational Disability term expires, an employee is eligible for "Total Disability" benefits if due to a "medically-determinable physical impairment," he is completely unable to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified or could reasonably become qualified on the basis of his ability, education, training or experience. (AR 286-87).

Plaintiff began working for FedEx as a Swing Driver/Courier/CDL on November 15, 1999. (AR 4).  Plaintiff received short-term disability benefits from FedEx Short Term Disability Plan ("STD Plan") from August 8, 2005, to February 5, 2006. (AR 4).  On February 6, 2006, Plaintiff transitioned to the LTD Plan and received long-term disability benefits for an Occupational Disability.  On December 28, 2007, Aetna sent Plaintiff a letter providing that effective February 6, 2008, Plaintiff was no longer eligible for long term disability benefits. (AR 6).  The letter explained that in order for Plaintiff to continue to receive long-term disability benefits for more than the twenty-four month Occupational Disability period, he must "submit medical documentation that clearly states the significant objective findings that substantiate a Total Disability." (AR 7). The letter explained that as of February 6, 2008, the LTD Plan's definition of Total Disability would apply and the documentation submitted by Plaintiff to Aetna

---

[1]   "AR" refers to the Administrative Record (Doc. 27, Exhibits 1-4) followed by the applicable page number.

as of that time did not support a Total Disability pursuant to the terms of the LTD Plan. (AR 6-8).  Plaintiff timely appealed the denial of LTD benefits, and FedEx's Benefit Review Committee (the "BRC") upheld the decision on October 8, 2008. (AR 99-100).

##     II.     Medical Evidence Within the Administrative Record

The Administrative Record contains the following medical evidence.  On August 18, 2005, September 27, 2005, October 7, 2005, November 5, 2005, December 19, 2005, and January 19, 2006, Harley Cohen, M.D., a rheumatologist, completed a form entitled "Attending Physician Statement – Rheumatology". (AR 53-58).  On these forms, Dr. Cohen noted that Plaintiff had been diagnosed with Sjogren's syndrome, fibromyalgia, and chronic pain syndrome. (AR 53-58). Dr. Cohen opined that Plaintiff's work restrictions included low physical stress, frequent breaks every 2 to 4 hours, and limited public contact. (AR 53-54, 57-58).  On each form, Dr. Cohen indicated that Plaintiff was able to work with restrictions. (AR 53-58).

On September 5, 2006, Plaintiff visited Dr. Cohen for a follow-up. (AR 60-61).  Dr. Cohen noted that Plaintiff complained of his eyes "matting shut" and complained of having the urge to constantly move his legs. (AR 60).  Plaintiff reported that his left foot burned and his right leg had a deep ache which was intensifying. (AR 60).  Plaintiff further reported that he experienced muscle tremors, yawning resulting in jaw quivering, muscle stiffness, and joint pain in his hips, ankles, knees, wrists, and fingers. (AR 60).  Also, Plaintiff complained of fatigue, his anterior chest wall enlargement, decreased appetite, cold intolerance, and left-sided headache. (AR 60).  Dr. Cohen further noted that Plaintiff reported having intermittent loose stools and gastrointestinal upset in general with some nausea. (AR 60).  Dr. Cohen noted that Plaintiff reported swimming frequently but that he had not done aquatic therapy as his insurance would not pay for it. (AR 60).  A physical exam of Plaintiff revealed Plaintiff to have a flat affect and

to be in no acute or apparent distress (AR 61).  Dr. Cohen found upon musculoskeletal exam that Plaintiff had a full range of motion in all joints but mild tenderness in bilateral wrists and bilateral elbows, tenderness in his left 3rd and 4th PIP joints and left 5th MCP joint. (AR 61).  Dr. Cohen noted stiffness in Plaintiff's left hemi-shoulder girdle and left rotator cuff, tenderness in bilateral knees, ankles, and MTP joints. (AR 61).  Dr. Cohen found that Plaintiff had widespread fibromyalgia tender points. (AR 61).  Dr. Cohen's impression was: (1) primary Sjogren's syndrome, (2) left anterior chest wall enlargement, (3) olecranon plaques, (4) fibromyalgia, (5) neuropathy versus restless leg syndrome, and (6) diarrhea/weight loss/anorexia. (AR 61).

On September 18, 2006, Plaintiff visited Dr. Cohen for a follow-up. (AR 62-63).  Dr. Cohen noted that Plaintiff reported "not as much burning in his legs as last visit" but that "the burning sensation is still present but diminished." (AR 62).  Dr. Cohen further noted that Plaintiff reported that his hands were less uncomfortable and that he was not twitching as much. (AR 62).  Plaintiff reported having passed blood from his rectum about two times the previous week and having an episode of diarrhea, but then did not pass any stool for a few days. (AR 62).  Dr. Cohen noted that Plaintiff complained of itching all over his body in the absence of any discrete rashes. (AR 62).  A physical examination of Plaintiff revealed him to be in no acute or apparent distress and to have tenderness in bilateral PIPs, MCPs, knees, and ankles. (AR 63).  Dr. Cohen noted that Plaintiff exhibited widespread fibromyalgia tender points. (AR 63).  Dr. Cohen's impression was the same as his from September 5, 2006, except he noted Plaintiff's rectal bleeding and diffuse itching. (AR 63).

A Radiological Report was completed by Paul Dorio, M.D., on November 14, 2006. (AR 66).  Dr. Dorio remarked that "Although not marked, no obvious abnormality is seen involving

the ribs.  The bones are unremarkable.  The visualized portions of the lungs are grossly clear." (AR 66).  Dr. Dorio's impression was "Negative ribs." (AR 66).

On February 8, 2007, Diane Brzezinski, D.O., an internist, completed a form entitled "Attending Physician Statement – Non-Specific Condition". (AR 67).  Dr. Brzezinski noted that Plaintiff was currently taking the medications Metanx, Prednisone, Plaquenil, Cellcept, Lyrica, Lexapro, Elocon, Zyrtec, Sinemet, and Omeprazole. (AR 67).  Dr. Brzezinski found that Plaintiff had the clinical conditions of Sjogren's syndrome, depression, anxiety, and neuropathy. (AR 67).  Dr. Brzezinski noted that Plaintiff physical exam revealed slowed mobility and blood work within normal limits. (AR 67).  Dr. Brzezinski indicated that she was unable to release the patient to work. (AR 67).

On March 27, 2007, Plaintiff visited Dr. Brzezinski for a follow-up after a colonoscopy. (AR 68).  Dr. Brzezinski noted that Plaintiff had an overgrowth of bacteria in the mouth and that Plaintiff complained of persistent joint pain. (AR 68).  A review of Plaintiff's systems revealed generalized joint pain and intermittent diarrhea and constipation. (AR 68).  Plaintiff's exam was largely normal. (AR 69).  Dr. Brzezinski's impression was (1) chronic diarrhea, (2) Sjogren's syndrome, (3) depression/anxiety, and (4) epistaxis. (AR 69).

On May 15, 2007, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 77).  Plaintiff reported that his stool was unchanged, that Imodium was making him constipated, and this constipation has been persistent since his colonoscopy in January. (AR 77).  Dr. Brzezinski noted that Plaintiff complained that his left foot felt on fire all the time and that his hips, knees, and fingers were stiff and hurt. (AR 77).  A review of Plaintiff's systems indicated neuropathy and weight gain. (AR 77).  Plaintiff's exams were largely normal. (AR 77)  Dr. Brzezinski's

impression was (1) Sjogren's syndrome, (2) persistent diarrhea, (3) neuropathy, and (4) anxiety. (AR 78).

On May 16, 2007, Plaintiff visited Dr. Cohen for a follow-up. (AR 71). Dr. Cohen noted that Plaintiff had recently had a colonoscopy on March 14, 2007, which was normal including biopsies. (AR 71). Dr. Cohen remarked that Plaintiff's fingers were stiff, his hips were tender, and his left leg pain was about the same. (AR 71). Dr. Cohen noted that Plaintiff's left shoulder was bothering him, especially when he turned his head, and that his arms jerk while he is asleep. (AR 71). A physical exam revealed that Plaintiff was in no acute or apparent distress and that he had mild tenderness in his bilateral DIPs, PIPs, and left shoulder. (AR 72). Dr. Cohen found that Plaintiff had points of allodynia at all points interior to the mid thighs but especially in the knees and ankles. (AR 72). Dr. Cohen summarized Plaintiff's laboratory work as follows:

> Endoscopy reports from Dr. Rya Kaplan dated March 14th, 2007, reviewed. On May 8th, 2007, Na 141, K 3.6, Cl 104, CO2 27.5, Ca 8.5, glucose 69, BUN 13, creatinine 1, ALT 51, AST 20, ALP 56, protein 6.9 albumin 3.6, globulin 3.3, sed rate 6, WBC 5.9, HB 14.9, HCT 43.2, platelet count 178, urinalysis negative for protein or blood, C-reactive protein of less than 0.2, C3 192, C4 13.7.

(AR 72). Dr. Cohen's impression was (1) stable Sjogren's syndrome, (2) stable left anterior chest wall enlargement, (3) fibromyalgia, (4) restless leg syndrome, (5) neuropathy, and (6) resolved diarrhea. (AR 72).

On June 5, 2007, Plaintiff visited Dr. Brzezinski. (AR 79). Dr. Brzezinski noted that she was not sure if Plaintiff was doing well on Cymbalta and that Plaintiff's "neuropathy is still a big problem." (AR 79). Dr. Brzezinski indicated that Plaintiff's cardiovascular, pulmonary, gastrointestinal, and extremity exams were normal. (AR 80). Dr. Brzezinski increased Plaintiff's prescription for Cymbalta, but otherwise Dr. Brzezinski's notes were the same as her previous notes. (AR 80).

On June 11, 2007, Dr. Brzezinski completed a form entitled "Attending Physician Statement – Non-Specific Condition". (AR 81). Dr. Brzezinski noted that Plaintiff's medications included Metanx, Prednisone, Plaquenil, Cellcept, Neurontin, Cymbalta, Sinemet, Benatryl, and Zyrtec. (AR 81). Dr. Brzezinski listed Plaintiff's clinical conditions as Sjogren's syndrome, depression, anxiety, and neuropathy. (AR 81). Dr. Brzezinski noted that Plaintiff had slow impaired mobility due to Sjogrens. (AR 81). Dr. Brzezinski indicated that she was unable to release Plaintiff to work. (AR 81).

On June 19, 2007, Plaintiff visited Dr. Cohen for a follow-up. (AR 82-83). Dr. Cohen diagnosed Plaintiff with primary Sjogren's syndrome, fibromyalgia, restless leg syndrome, left anterior chest wall enlargement, and neuropathy. (AR 81). Dr. Cohen noted that Plaintiff's legs were feeling better but Plaintiff still had some discomfort. (AR 81). Dr. Cohen noted that Plaintiff had an upper respiratory tract infection over the past few weeks. (AR 81). Plaintiff had stiffness of his hands and stiffness in other joints, decreased energy, stable appetite, and a crusty rash in his moustache. (AR 81). Plaintiff reported getting muscle jerks sometimes at night but this had improved. (AR 81). A physical examination of Plaintiff revealed that he was in no acute or apparent distress, that he had no tender or swollen joints although he did have scattered fibromyalgia tender points, and no new rashes or lesions. (AR 82). Dr. Cohen's impression was 1) Sjogren's syndrome, 2) left anterior chest wall enlargement, 3) fibromyalgia, 4) restless leg syndrome, and 5) neuropathy. (AR 83).

On July 25, 2007, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 84). Dr. Brzezinski noted that Plaintiff's cardiovascular, pulmonary, gastrointestinal, and extremity exams were normal. (AR 84). Dr. Cohen noted that Plaintiff had onychomycosis, and diagnosed Sjogren's, fibromyalgia, peripheral neuropathy, anxiety, and seborrhoeic dermatitis. (AR 84).

On August 7, 2007, Plaintiff had blood work done at Naples Medical Center.  Plaintiff's red blood cell count was low at 4.29, hematocrit was low at 40.8. (AR 75).  Plaintiff's remaining test results were within normal range. (AR 75-76).

On August 14, 2007, Plaintiff visited Dr. Cohen for a follow-up. (AR 85).  Plaintiff reported that his medication of Cymbalta and Neurontin was helping his neuropathy. (AR 85).  Dr. Cohen noted that Plaintiff had briefly been on 90 mg a day of Cymbalta but had side effects on this and so Dr. Brzezinski reduced him back to 60 mg a day. (AR 85).  Dr. Cohen noted that Plaintiff's energy was low but stable. (AR 85).  Dr. Cohen noted that Plaintiff self-reported increased tremors along with joint pain in wrists, ankles and feet; morning stiffness and subjective fevers; stiffness in hands; rough patches on his elbows, knees, and toes; incessant itching; urinary instability; and pain in his testicles. (AR 85).  A physical examination revealed that Plaintiff was not in acute or apparent distress, had no edema of extremities, no tender or swollen joints, and no new rashes or lesions. (AR 85).  Dr. Cohen summarized the laboratory work taken on August 7, 2007, as follows:

> On August 7th, 2007, Na 138, K 4.2, Cl 101, CO2 33, Ca 9.1, glucose 92, BUN 17, creatinine 0.9, ALT 46, AST 21, ALP 71, protein 6.9, albumin 3.9, globulin 3, WBC 5.9, HB 14.3, HCT 40.6, platelet count 189, sed rate 7, C-reactive protein of less than 0.2, C3 113, C4 18.6.

(AR 86).  Dr. Cohen's diagnosis was stable primary Sjogren's syndrome, stable left chest wall enlargement, fibromyalgia, restless leg syndrome, and neuropathy. (AR 86).

On August 21, 2007, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 87-88).  Plaintiff reported that Cymbalta was helping his neuropathy but that he had side effects, that he can't even pick up screws, and has difficulty even standing at dishwasher due to foot pain. (AR 87).  Plaintiff reported itchy skin. (AR 87).  Dr. Brzezinski noted that "psych had mentioned to wife that maybe he has manic depression" as Plaintiff stays awake 3 days and then crashes. (AR

87).   Plaintiff's cardiovascular, pulmonary, gastrointestinal, and extremity examinations were normal.  (AR 88).   Dr. Brzezinski diagnosed Plaintiff with Sjogren's/autoimmune disease/seborrhoeic dermatitis, depression/anxiety, fibromyalgia, and peripheral neuropathy. (AR 88).

On September 10, 2007, Dr. Brzezinski completed a report at the request of Aetna.  (AR 89).  Dr. Brzezinski indicated Plaintiff "is unable to work at any compensable employment for a minimum of twenty-five hours per week." (AR 89).  On the same day, Dr. Cohen also indicated in a report at the request of Aetna that Plaintiff is "unable to work at any compensable employment for a minimum of twenty-five hours per week." (AR 90).  Neither doctor provided Aetna with copies of Plaintiff's last three office notes, labs, and/or diagnostic results that substantiate a physical impairment preventing [him] from performing a sedentary job for a minimum of twenty-five hours per week as requested. (AR 89-90).

On October 16, 2007, Plaintiff visited Dr. Cohen for a follow-up. (AR 92-93).  Dr. Cohen noted that Plaintiff had reported to Dr. Brzezinski a couple of weeks earlier that his skin hurt to light touch and itched a lot. (AR 92).   About a week earlier Plaintiff had noted increased torso pain. (AR 92).   Plaintiff reported that he had developed a rash beneath his umbilicus. (AR 92). Dr. Cohen noted that Plaintiff was still having left leg pain as well as left ankle and foot pain. (AR 92).   Dr. Cohen noted that Plaintiff reported that his hands were stiff most of the time and if he was "dormant" for more than 15 minutes he feels stiff. (AR 92).   Dr. Cohen noted that Plaintiff complained of left sided headaches and pain behind the left eyeball. (AR 92).   Plaintiff reported having low grade fevers of 99-100, episodic diarrhea, nasal ulcers, and mouth ulcers. (AR 92). Dr. Cohen noted that Plaintiff complained of a congested feeling with shortness of breath up flights of steps but denied any chest pain or cough. (AR 92).   A physical examination revealed

that Plaintiff's respiratory, cardiovascular, abdominal, and extremity examinations were normal. (AR 93).  Dr. Cohen noted that Plaintiff's skin had a few popular lesions over his right lower abdomen which had a wart-like appearance. (AR 93).  Plaintiff's musculoskeletal examination revealed mild tenderness in bilateral PIP joints and left MCP joints and mild tenderness in bilateral knees and ankles. (AR 93).  Dr. Cohen summarized Plaintiff's laboratory work as follows:

> On September 24th, 2007, glucose 95, BUN 16, creatinine 0.9, GFR greater than 60, Na 142, K 4.2, Cl 105, CO2 28, Ca 9.9, protein 7.4, albumin 4.5 globulin 2.9, alk phos 69, AST 19, ALT 20, sed rate 1, WBC 6.7, HB 15.3, HCT 44.8, platelet count 192, C3 125, C4 24, C-reactive protein undetectable, C3 total 126, C4 total 7.1, TSH 1, urinalysis from today showed no evidence of protein or blood and was otherwise normal.

(AR 93).  Dr. Cohen diagnosed plaintiff with stable Sjogrens syndrome, left chest wall enlargement, fibromyalgia, restless leg syndrome, neuropathy, and lower abdominal rash. (AR 92-93).

On November 5, 2007, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 95).  Dr. Brzezinski noted that Plaintiff reported that his pain was not as bad but that Ibuprofen was not doing much for him. (AR 95).  Plaintiff's left foot was cold and numb and his left ankle was weak and painful. (AR 95).  Dr. Brzezinski noted that Plaintiff reported feeling sharp pain in his left thumb. (AR 95).  A review of Plaintiff's systems indicated arthritis, joint pain and swelling, and rash. (AR 95).

A "Medical List" from Dr. Brzezinski dated December 4, 2007, shows that Plaintiff was prescribed Metanx, Prednisone, Plaquenil, Cellcept, Neurontin, Sinemet, Zyrtec, Bentyl, Desowen lotion and Lexapro.[2] (AR 94).

---

[2] Cymbalta and Elocon cream are also listed but have a line drawn through them.

On December 24, 2007,[3] Mark Borigini, M.D., of MES Solutions performed a Physician Review of Plaintiff's medical file. (AR 102-103).  Dr. Borigini acknowledged Plaintiff's prior diagnosis of Sjogren's syndrome, fibromyalgia, restless leg syndrome, neuropathy, and "joint pain on examination." (AR 103).  Dr. Borigini noted that Plaintiff was having joint pain and stiffness per documented physical examination, despite being on immunosuppressive medications and that Plaintiff's Prednisone dosage had recently been increased. (AR 103).  Dr. Borigini explained that Sjogren's is a systemic inflammatory condition which causes significant stiffness, which is documented in Plaintiff's medical file. (AR 103).  After reviewing Plaintiff's medical record, Dr. Borigini found that "[b]ased on the documentation, it does reveal a functional impairment however, it would not preclude the claimant from engaging in any compensable employment for a minimum of twenty-five hours per week as long as he is allowed to get up and stretch every 15 minutes." (AR 103).

On January 10, 2008, Plaintiff visited Dr. Brzezinski. (AR 26).  Dr. Brzezinski noted that Plaintiff reported fatigue and weakness. (AR 26).  Plaintiff reported having discomfort, stiffness when closing hands, and a small boil on his chest which he had opened and drained himself. (AR 26).  Plaintiff reported that he had pain in his left anterior chest wall which even a seatbelt bothers. (AR 26).  Also, Plaintiff complained of itchy skin, and sores in his mouth which were healing. (AR 26).  Plaintiff's general, cardiovascular, pulmonary, gastrointestinal, and skin exams were normal. (AR 27).  Dr. Brzezinski's impression was Sjogren's syndrome, seborrhoeic dermatitis, fibromyalgia, and peripheral neuropathy. (AR 27).

---

[3]  The Court notes that Dr. Borigini completed his Physicians Review on December 14, 2007.  A corrected copy of this review from December 24, 2007, is contained in the record.

On April 9, 2008, Plaintiff visited Catherine N. Kowal, M.D., a rheumatologist, on a referral from Dr. Brzezinski. (AR 12).  Dr. Kowal noted that Plaintiff was a 48 year old male who is in a lot of pain, predominantly in his muscles and shoulders. (AR 12).  Dr. Kowal noted that Plaintiff gets rashes across his chest, has poor energy, some chest pain, dry eyes without dry mouth, irritable bowel syndrome symptoms, morning stiffness lasting for ½ hour and joint swelling of the right finger PIP. (AR 12).  A physical examination of Plaintiff revealed that he had no rash or lesions, normal sclera, no oral ulcers, and "good saliva pooling". (AR 13).  Plaintiff's examination was normal with slight tenderness and tightness in his lumbosacral spine region. (AR 13).  Plaintiff's examination revealed his shoulders to have full range of motion, elbows to have tenderness lateral epicondyle, no effusion, and wrists without synovitits or tenderness with full range of motion. (AR 13).  Dr. Kowal's impression was that Plaintiff's "symptoms and signs are consistent with a fibromyalgia picture, but he may have an underlying autoimmune situation as well." (AR 14).  Dr. Kowal recommended that Plaintiff begin taking Ultram and remarked that "he needs to have a healthy lifestyle with a good exercise program which he doesn't do, and hopefully this will improve.  He has been on disability for three years and it would be helpful to get him a little bit more active. (AR. 14).  Plaintiff was directed to follow-up after having his blood work done. (AR 14).

On May 22, 2008, Plaintiff had blood work done at DSI Laboratories in Fort Myers, Florida. (AR 17).  The test results showed that Plaintiff's sed rate, C-reactive protein, SSB (LA), C3 Complement, C4 Complement, and CCP test results were within normal range. (AR 17-21).  Plaintiff's DNA-ds and Smith Antibody tests were within normal range.  According to the test result report, the presence of Smith and DNA-ds antibodies "is essentially diagnostic for SLE (systemic lupus erythematosus)." (AR 19).  According to the test result report, "SSA antibodies

are found in up to 70% of patients with Sjogren's syndrome and 25-40% of patients with ANA-positive systemic lupus erythematosus. (AR 20).

On June 9, 2008, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 24).  Dr. Brzezinski noted that Plaintiff reported experiencing excruciating rib tenderness on his left side, stiffness and pain in his fingers, and having trouble picking anything up. (AR 24).  Dr. Brzezinski noted synovitis and effusion at Plaintiff's 1st PIP and tenosynovitis at Plaintiff's left deltoid. (AR 25).  Dr. Brzezinski noted that Plaintiff's cardiovascular, pulmonary, gastrointestinal, and extremity examinations were normal. (AR 25).  Dr. Brzezinski diagnosed lupus, Sjogren's syndrome, finger synovitis, fibromyalgia, and peripheral neuropathy. (AR 25).

On June 30, 2008, Plaintiff visited Dr. Brzezinski for a follow-up. (AR 29).   Dr. Brzezinski noted that Plaintiff complained of nausea and diarrhea that had lasted for a couple of weeks which was not severe except for a few days. (AR 29).  Plaintiff reported experiencing pain along his left jaw, ear and neck. (AR 29).  Dr. Brzezinski noted that Plaintiff's cardiovascular, pulmonary, gastrointestinal, and extremity examinations were normal. (AR 25).  Dr. Brzezinski's impression was 1) diarrhea, 2) nausea, 3) lupus, 4) Sjogren's syndrome, 5) anxiety/depression, 6) fibromyalgia, and 7) peripheral neuropathy. (AR 30).

On July 17, 2008, Plaintiff visited Cliff R. Haight, D.C., a chiropractor. (AR 34).  Dr. Haight noted that Plaintiff complained of extensive pain in his back, neck, feet, ankles, knees, hips, hands, shoulders, and head. (AR 34-35).  On a visual analog scale of 0 to 10 with 0 being no pain and 10 being the worst pain possible, Plaintiff indicated that his overall pain was 8. (AR 35).  Dr. Haight found that Plaintiff's right leg was "5/8 of an inch short indicating pelvic deficiency, leg length inequality, or reactive misalignment." (AR 35).  Dr. Haight performed

mechanical force adjustment to correct subluxation, reduce joint dysfunction, and enhance joint mobility, and performed myofascial release on the lumbrosacral spine. (AR 35-36).

A "Radiographic Evaluation-Summary" was completed by Dr. Haight on July 18, 2008. (AR 33). As to Plaintiff's cervical spine, Dr. Haight found Plaintiff to have severe disc narrowing at C2-3, and C5-C6. (AR 33). Dr. Haight found Plaintiff to have instability with stress at C3-C4 and C4-C5 with flexion. (AR 33). Dr. Haight also found Plaintiff to have moderate general osteoporosis. (AR 33). As to Plaintiff's lumbosacral spine, Dr. Haight found Plaintiff to have mild disc narrowing at L1-L2, L2-L3, L3-L4, moderate disc narrowing at L4-L5, and severe disc narrowing at L5-S1. (AR 33). Dr. Haight found that Plaintiff's lumbar curve was severely hyperlordotic and that his pelvis twisted to the right. (AR 33).

Plaintiff visited Dr. Haight on July 24, 2008. (AR 37). Dr. Haight's findings were largely identical to his findings from his previous examination of Plaintiff. Dr. Haight performed a mechanical force adjustment to increase intersegmental/segmental range-of-motion, alleviate misalignments, and correct subluxations. (AR 37).

On August 13, 2008, Wendy Weinstein, M.D., reviewed Plaintiff's file. (AR 104-107). Dr. Weinstein noted that medical documentation indicates Plaintiff as having subjective complaints of diffuse pain and references Plaintiff's "diagnoses of Sjogren's syndrome, fibromyalgia, and possible lupus." (AR 105). Dr. Weinstein noted that the medical documentation included Plaintiff's complaints of generalized joint pain and intermittent diarrhea. (AR 105). Dr. Weinstein conducted a chronological review of Plaintiff's medical documentation, ultimately concluding that Plaintiff's conditions fail to support a functional impairment because "none of the clinical information from treating providers documents significantly abnormal

physical examination findings that would support functional impairments from sedentary work for 25 hours per week." (AR 107).

### III.   Legal Standard

Given the unique considerations present in an ERISA benefit denial case, the standard summary judgment considerations do not apply. *Hert v. Prudential Ins. Co. of Am.,* 650 F.Supp.2d 1180, 1190 (M.D. Fla. 2009). "Where a decision to grant or deny benefits is reviewed for abuse of discretion, motion for summary judgment is merely the conduit to bring the legal question before the district court and usual tests of summary judgment, such as whether a genuine dispute of material fact exists do not apply." *Id.* (citing *Crume v. Metro. Life Ins. Co.,* 417 F.Supp.2d 1258, 1272 (M.D. Fla. 2006). "[I]n a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Crume,* 417 F.Supp.2d at 1272.

"ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or fiduciaries." *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989)).  The Eleventh Circuit, however, has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decision." *Id.*  The six steps in this framework are:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is *"de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is *"de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355. As to the sixth step in the analysis, the Eleventh Circuit eliminated the heightened standard of review applicable when a conflict of interest is present. *Doyle v. Liberty Life Assurance Co. of Boston,* 542 F.3d 1352, 135 (11th Cir. 2008) (providing that the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008) implicitly overruled Eleventh Circuit precedent "to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard."). A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds. *Blankenship,* 655 F.3d at 1355. Even where a conflict of interest exists, courts still "owe deference" to the plan administrator's "discretionary decision-making" as a whole. *Id.* The claimant bears the burden of proving he is entitled to benefits. *Horton v. Reliance Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir. 1998).

## IV.   Discussion

As an initial matter, the Court will address the issue of whether Aetna is a proper defendant in this case. Defendants argue that based on Aetna's status as a mere Claims Paying Administrator and its limited role of plan administration, this lawsuit should be dismissed for misjoinder under Fed. R. Civ. P. 21. (Doc. 78 p. 18). Defendant contends that Plaintiff's allegations are based on

entitlement to LTD Plan benefits, and the LTD Plan—not Aetna—bears financial responsibility for payment of benefits and also any judgment that may issue. (Doc. 78 p. 18-19).

Plaintiff responds that at all relevant times, Aetna acted as a Claims Paying Administrator under the Plan, and an administrator within the meaning of 29 U.S.C. § 1002(16)(A). (Doc. 86 p. 1).  Citing to *Nystrom v. AmerisourceBergen Drug Corp.,* 2013 WL 5944254, at *2 (D. Minn. Nov. 6, 2013), Plaintiff argues that the relevant statutory provision imposes no explicit limitations on entities that may be defendants in an ERISA claim. (Doc. 86 p. 1-2).  Plaintiff contends that Aetna rendered the initial decision to deny Plaintiff's Total Disability Claim and is, thus, a proper party to this case because it exercised control over the Plan's decision making and claims processes. (Doc. 86 p. 1).

"ERISA provides that a 'civil action may be brought by a participant or beneficiary . . . to recover benefits due . . . under the terms of [the] plan.'" *Hamilton v. Allen-Bradley Co., Inc.,* 244 F.3d 819, 824 (11th Cir. 2001) (citing 29 U.S.C. § 1132(a)(1)(B)).  "In the Eleventh Circuit, this section confers a right to sue the plan administrator for recovery of benefits." *Id.* (citing *Rosen v. TRW, Inc.,* 979 F.2d 191, 193-94 (11th Cir. 1992)).  However, even if an entity is not identified as an administrator by the terms of the plan, it may be sued.  The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan. *Garren v. John Hancock Mut. Ins. Co.,* 114 F.3d 186, 187 (11th Cir. 1997).

In this case, the terms of the LTD Plan specify that the administrator is FedEx. (AR 277-278).  Thus, in arguing that Aetna is a proper defendant in this case, Plaintiff seems to argue that Aetna is a *de facto* plan administrator due to its role in the LTD Plan's claims process.  The Eleventh Circuit, however, has held that "where a plaintiff has sought to hold a third-party administrative services provider liable, rather than the employer, we have rejected the *de facto*

plan administrator doctrine." *Oliver v. Coca Cola Co.,* 497 F.3d 1181, 1194 (11th Cir. 2007)

*vacated in part on petition for reh'g,* 506 F.3d 1316 (11th Cir. 2007). The Eleventh Circuit

explained that to hold administrative services providers liable for providing administrative

services "would undercut the ability of employers to contract out the administrative tasks

associated with operating an ERISA plan." *Id.* The facts of this case demonstrate that Aetna's

role under the LTD Plan is to provide claims services pursuant to the terms and processes agreed

to by the parties. (AR 315-319). At no time did Aetna control administration of the plan and

there are is no supporting law or facts to find that Aetna is an appropriate defendant as the claims

paying administrator. *See Braden v. Aetna Life Ins. Co.,* 2013 WL 6086460, at *3 (Nov. 19,

2013). Thus, the Court recommends that Aetna be dismissed as a defendant in this case. The

Court will now proceed to analyze whether Plaintiff's denial of benefits was erroneous.

> **a) Whether FedEx's decision to deny long term disability benefits was de novo wrong**

Under the six-step analysis described above, the Court must first assess whether FedEx's

decision to deny Plaintiff's claim for long term disability benefits was "wrong" under the *de*

*novo* standard—that is, whether the Court disagrees with that decision. *Jones v. Federal Express.*

*Corp.,* 2013 WL 6038734, at *3 (M.D. Fla. Nov. 14, 2013). "Review of the plan administrator's

denial of benefits is limited to consideration of the material available to the administrator at the

time it made its decision." *Blankenship,* 644 F.3d at 1354.

Under the LTD Plan, "Total Disability" is defined as "the complete inability of a Covered

Employee, because of a medically-determinable physical impairment (other than an impairment

caused by a mental or nervous condition or a Chemical Dependency), to engage in any

compensable employment for twenty-five hours per week for which he is reasonably qualified

(or could reasonably become qualified) on the basis of his ability, education, training or

experience." (AR 286-287).  The LTD Plan provides that such Total Disability must be "substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological, or psychological abnormalities which can be observed apart from the individual's symptoms." (AR 279-280).  Thus, given the terms of the LTD Plan, in analyzing whether the decision to deny Plaintiff's claim for long term disability benefits was *de novo* "wrong," the Court must ultimately determine whether the Administrative Record contains significant objective findings showing that Plaintiff has medically-determinable impairments which preclude him from engaging in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience.

After a review of the medical evidence contained in the Administrative Record, the Court finds that the decision to deny Plaintiff LTD benefits was not *de novo* wrong.  Although the evidence in the Administrative Record shows that Plaintiff visited multiple doctors pertaining to his diagnoses of Sjogren's syndrome, fibromyalgia, anxiety/depression, peripheral neuropathy, lupus, restless leg syndrome, and a variety of other ailments, these records fail to demonstrate that Plaintiff is incapable of engaging in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience.  Treatment notes from these visits show that Plaintiff's physicians relied heavily on Plaintiff's self-reported subjective symptoms which are largely unsupported by significant objective findings corroborating Plaintiff's alleged degree of functional limitation.  For example, although Plaintiff's treatment notes from his visits with treating physician Dr. Cohen indicate that Plaintiff continually complained of diffuse pain, Dr.

Cohen's objective physical examinations consistently revealed Plaintiff to have a flat affect and to be in no acute or apparent distress. (AR 61, 63, 72, 82, 85, 92).  Likewise, while these physical exams revealed that Plaintiff consistently had tenderness in bilateral wrists and bilateral elbows, tenderness in his left 3rd and 4th PIP joints and left 5th MCP joint, stiffness in left hemi-shoulder girdle and left rotator cuff, tenderness in knees, ankles, and MTP joints (AR 61, 63, 72), these exams indicated that the tenderness was often mild and, on one occasion, that Plaintiff had a full range of motion in all joints. (AR 61, 72, 93).  These findings are consistent with those of Dr. Kowal, who on April 9, 2008, found that Plaintiff shoulders, elbows, wrists, and hips all had a full range of motion. (AR 13).  Treatment notes from Dr. Brzezinski are similar to those of Dr. Cohen in that while noting Plaintiff's subjective complaints, the physical examination findings reveal largely normal systems. (AR 67, 68, 77, 79, 84, 87).

Furthermore, Plaintiff's lab tests results are largely within normal range, with only occasional abnormal results. (AR 14-21, 73-74, 75-76, 91).  Plaintiff takes issue with Defendants' treatment of his lab tests, arguing that Defendants "attempt to distort the objective evidence, ignore the nature of Mr. Gordon's symptoms, and ignore the meaning of the abnormal objective test results." (Doc. 86 p. 5).  For example, Plaintiff notes that abnormalities reported in his 2007 blood and urine tests provide the following abnormalities: high glucose and low lymphocytes blood test in January 2007 (AR 73) evidencing possible infection; low glucose blood test in May 2007 (AR 73); abnormal red blood cell count, low hemocrit, and low complement 4 in August 2007 (AR 75-76) evidencing kidney and liver disease, as well as lupus and rheumatoid arthritis; and urinalysis reports from October 2007 (AR 91) indicating abnormal specific gravity which can be an indication of kidney failure. (Doc. 86 p. 5-6).  However, even considering Plaintiff's explanation of the significance of these abnormal results, these results fail

to show that Plaintiff's conditions cause such functional impairments that he meets the definition of Total Disability.

The radiological evidence in the record does provide evidence in favor of Plaintiff's claim. While the radiological report by Dr. Dorio from November, 2006 indicated that Plaintiff had no abnormality involving his ribs (AR 66), treatment notes from chiropractor Dr. Haight indicate Plaintiff has physical abnormalities. Dr. Haight found that Plaintiff's right leg was 5/8 of an inch short indicating pelvic deficiency, leg length inequality, or reactive misalignment. (AR 35). An examination of Plaintiff confirmed that he had severe limitation and pain on range of motion tests of the cervical, thoracic, and lumbar spine. (AR 41-42). Dr. Haight found in the Radiographic Evaluation from July 18, 2008, that Plaintiff had severe disc narrowing at C2-3 and C5-C6, instability with stress at C3-C4 and C4-C5 with flexion, moderate general osteoporosis, mild disc narrowing at L1-L2, L2-L3, L3-L4, moderate disc narrowing at L4-L5, and severe disc narrowing at L5-S1. (AR 33). Dr. Haight found that Plaintiff's lumbar curve was severely hyperlordotic and that his pelvis twisted to the right. (AR 33). While the objective evidence from Dr. Haight weighs in favor of Plaintiff's claim for LTD benefits, the Court cannot find that Dr. Haight's treatment notes constitutes significant objective evidence demonstrating Plaintiff meets the definition of Total Disability. Importantly, the Court notes that the extensive spinal problems found by Dr. Haight are not reflected in the treatment notes of Plaintiff's long-time treating physicians.

The Court does not doubt that Plaintiff's medical conditions cause him significant pain. However, the determination the Court must make is not whether Plaintiff experiences pain, but whether the Administrative Record contains significant objective findings showing that Plaintiff has medically-determinable impairments which preclude him from engaging in any compensable

employment for twenty-five hours per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training or experience. *See Howard v. Hartford Life & Accident Ins. Co.,* 929 F.Supp.2d 1264, 1288 (M.D. Fla. 2013) ("While the Court recognizes that Howard suffers from an array of ongoing medical problems and chronic pain, the question presented by her claim of unlawful termination of disability benefits is whether her medical conditions are sufficiently work-preclusive to establish disability under the ERISA Plan"). Given the paucity of objective evidence in the Administrative Record, the Court cannot find that Plaintiff carried his burden of demonstrating that he meets the definition of Total Disability.  Accordingly, the Court finds that FedEx's decision to deny Plaintiff's LTD benefits was not *de novo* wrong.

Under the Eleventh Circuit's six-step analysis, a finding that a claim administrator's decision was not *de novo* wrong ends the inquiry in favor of the claim administrator. *Blankenship,* 644 F.3d at 1355.  Nevertheless, the Court will proceed to the second step to determine whether the decision was arbitrary and capricious.

**b)  Whether FedEx's decision to deny long term disability benefits was arbitrary and capricious**

At the second step in the Eleventh Circuit's six-step analysis, the Court must next determine whether the administrator was vested with discretion in reviewing the Plaintiff's claim. *Blankenship,* 644 F.3d at 1355.  Here, the LTD Plan grants the BRC discretion to review the decisions of the claims paying administrator in accordance with the LTD Plan's terms. (AR 322).  According to the LTD Plan, the BRC is "empowered to interpret the Plan's provisions in its <u>sole and exclusive discretion</u> in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan." (AR 322) (emphasis added).  The LTD Plan

further provides that "[t]he determination of the appeal committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious." (AR 322). Therefore, as the administrator was vested with discretion, the Court must determine whether the BRC's denial of Plaintiff's LTD benefits was arbitrary and capricious.

"Under the arbitrary and capricious standard of review, the court seeks to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made." *Howard,* 929 F.Supp.2d at 1288 (citing *Townsend v. Delta Family-Care Disability and Survivorship Plan,* 295 F. App'x 971, 976 (11th Cir. 2008)). Thus, under this standard, even if a decision to deny benefits is *de novo* wrong, so long as a reasonable basis supports the decision, the decision will not be overturned. *Manning v. Johnson & Johnson Pension Committee,* 504 F.Supp.2d 1293, 1303 (M.D. Fla. 2007) (citing *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 994 (11th Cir. 2001)). As long as a reasonable basis supports the decision, it must be upheld as not being arbitrary or capricious, even if there is evidence that supports a contrary decision. *White v. Coca-Cola Co.,* 542 F.3d 848, 856 (11th Cir. 2008) (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1140 (11th Cir. 1989)).

As the BRC has the ultimate decision making authority, its denial letter dated October 8, 2008, constitutes the final decision denying Plaintiff's claim for Total Disability. (AR 1-3). In the denial letter, the BRC explained that it had reviewed the submitted documentation and noted that Plaintiff has had complaints of muscle and joint pain, continued fatigue and stiffness, as well as nausea and diarrhea. (AR 2). The BRC also acknowledged Plaintiff's diagnoses of

fibromyalgia, lupus, Sjogren's syndrome, restless leg syndrome, neuropathy, depression and anxiety. (AR 2).  The BRC further specified that in addition to all medical documentation, it consulted the reviews performed by Aetna peer physicians, Drs. Borigini and Weinstein. (AR 2). The BRC noted that Dr. Borigini, after reviewing Plaintiff's medical documentation on December 14, 2007, opined that although Plaintiff has a functional impairment, it would not preclude him from engaging in any compensable employment for a minimum of 25 hours per week, as long as Plaintiff is allowed to get up and stretch every 15 minutes. (AR 2).  As to Dr. Weinstein, the BRC noted her opinion that none of the clinical information from Plaintiff's treating providers documented significantly abnormal physical examination findings that would support functional impairments from sedentary work for 25 hours per week. (AR 2).  The BRC explained, "[f]ollowing a thorough review and discussion of all the documents submitted, including the medical documentation and the peer physician reviews, the Committee found that there were insufficient objective findings to preclude [Plaintiff] from engaging in any compensable employment for 25 hours per week for which you are reasonably qualified (or could reasonably become qualified) on the basis of your ability, education, training or experience." (AR 3).

Plaintiff presents several arguments that the denial of LTD benefits was arbitrary and capricious.  First, Plaintiff argues that FedEx and the reviewing peer physicians failed to apply the proper standard for disability benefits because they failed to conduct any investigation as to Plaintiff's education, training, and experience. (Doc. 79 p. 13).  Citing to the non-binding case *Gross v. Federal Express Corp. Long Term Disability Plan,* 707 F.Supp.2d 67 (D. Mass. 2010), Plaintiff argues that Defendants' failure to conduct an employability assessment of Plaintiff prior to the denial of LTD benefits was unreasonable. (Doc. 79 p. 13-14).

Defendants respond that the BRC applied the Proper LTD Plan terms and conditions to Plaintiff's claim. (Doc. 85 p. 13). Defendants argue that in the absence of any significant objective findings as of February 6, 2008, it was not necessary to engage in an analysis as to whether there was any compensable employment that Plaintiff was capable of performing. (Doc. 85 p. 13). Defendant contends Plaintiff's reliance on *Gross* is misplaced and the court in *Gross* actually agreed with FedEx's position that it is reasonable to interpret the language of the LTD Plan as not requiring an employability assessment. (Doc. 85 p. 13).

Under the terms of the LTD Plan, "Total Disability" is defined as the complete inability of a Covered Employee, because of a medically-determinable physical impairment (other than an impairment caused by a mental or nervous condition or a Chemical Dependency), to engage in any compensable employment for twenty-five hours per week for which he is reasonably qualified (or could become reasonably qualified) on the basis of his ability, education, training or experience." (AR 286-287). In *Gross*, the court interpreted the LTD Plan's definition of Total Disability. In the case, the plaintiff sued FedEx's LTD Plan after being denied LTD benefits. The plaintiff did not dispute the review committee's conclusions about his physical and mental conditions, but instead argued that while he was theoretically able to perform some light work requiring low intellectual skill, there are no actual jobs matching this description. *Gross*, 707 F.Supp.2d at 72. In interpreting the LTD Plan's definition of Total Disability, the court remarked that it

> agrees with FedEx's position that it is reasonable to interpret the language of the LTD Plan as not requiring an employability assessment. This means that the Committee was not required to demonstrate that some employment was actually **available** for Gross. The Court disagrees, however, that FedEx can go further and interpret the definition as not requiring an evaluation as to whether any job **existed**, which Gross was capable of performing based on his ability, education, training or experience. Such an interpretation entirely ignores half of the definition of "totally disabled," namely "an inability of a Covered Employee . . . to engage in any compensable employment for twenty-five hours

per week for which he is reasonably qualified (or could reasonably become qualified) on the basis of his ability, education, training, or experience.

*Id.* at 73 (emphasis in original).  The court did not hold, however, that the review committee had

a duty to perform an evaluation as to whether any job existed every time benefits were denied.

The court further explained that

the Committee had to analyze whether there existed compensable employment that Gross was capable of performing, taking into account his physical impairment and low mental ability.  It is true that the Committee was not obliged to name any types of positions because the burden was on Gross to show by substantial objective findings that he is not able to engage in any employment.  Once Gross came forward with evidence supporting his position, however, the Committee could not just disregard it.

*Id.* The plaintiff in *Gross* submitted substantial evidence to the review committee including

printouts from the O*Net database and a vocational expert's report concluding that the plaintiff

was disabled from all occupations. *Id.*

The Court finds *Gross* inapplicable to the facts of this case.  Unlike in *Gross*, Plaintiff is

challenging the review committee's conclusion as to his physical condition, i.e., the BRC's

finding that there was no significant objective findings that Plaintiff had **any** impairment which

precluded him from engaging in any compensable employment for 25 hours.  In the absence of

any impairment finding, the BRC was not required to conduct an employability assessment to

determine if Plaintiff could still work despite his impairment, as the court in *Gross* required.

Thus, the Court does not find that the BRC's decision was arbitrary and capricious because it did

not conduct an employability assessment.

Next, Plaintiff argues that FedEx's reliance on the records reviews of Drs. Borigini and

Weinstein to conclude that Plaintiff did not meet the definition of total disability was

unreasonable. (Doc. 79 p. 14).  Plaintiff argues that a comparison of the medical records that Dr.

Weinstein indicates she reviewed and her report findings shows that her opinions are unreliable.

(Doc. 79 p. 15).  In particular, Plaintiff argues that Dr. Weinstein fails to ever mention the significant abnormal findings noted on the laboratory tests that she reviewed, which Plaintiff argues confirm Plaintiff's autoimmune disorders and related symptoms. (Doc. 79 p. 15-16).

Defendant responds that contrary to Plaintiff's assertion that his treating physicians' opinions were supported by substantial objective evidence, this is clearly not the case. (Doc. 85 p. 15).  Defendant argues that blood test results date January 29, 2007, May 8, August 7, and September 24, 2007 had a few mild abnormalities, but were otherwise normal. (Doc. 85 p. 16). Defendant argues that until April 2008, Plaintiff's treating physicians completely failed to perform objective tests and instead chose to report Plaintiff's subjective symptoms. (Doc. 85 p. 17).  Defendant also argues that the fact that Plaintiff subsequently, months after the Total Disability date of February 6, 2008, sought chiropractic treatment and had blood test results possibly indicative of autoimmune disease does not create significant objective findings. (Doc. 85 p. 18).

"A plan administrator has no obligation to give a treating physician's opinion more weight." *Gipson v. Admin. Committee of Delta Airlines, Inc.,* 350 F. App'x 389, 395 (11th Cir. 2009) (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003)).  The Eleventh Circuit has held that it "is entirely appropriate for an administrator to rely on written reports of consultants who have done paper review of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Howard v. Hartford Life & Acc. Ins. Co.,* 929 F.Supp.2d 1264, 1297 (M.D. Fla. 2013) (quoting *Giertz –Richardson,* 536 F.Supp.2d. 1280, 1291 (M.D. Fla. 2008)).  However, "a plan administrator has discretion to deny benefits based on its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians, unless the record does not support the

denial." *Gharagozloo v. Aetna Life Ins. Co.,* 2009 WL 3753589, at \*21 (M.D. Fla. Nov. 5, 2009) (citing *Midgett v. Washinton Group Int'l LTD Plan,* 561 F.3d 887 (8th Cir. 2009)).

Here, the Court finds that the BRC's reliance and emphasis on the opinions of reviewing physicians Drs. Borigini and Weinstein does not render FedEx's denial of benefits arbitrary and capricious. As to Dr. Borigini, in his review he noted that Plaintiff has Sjogren's syndrome, fibromyalgia, restless leg syndrome, neuropathy, and joint pain on examination. (AR 103). Dr. Borigini noted that Plaintiff was having joint pain and stiffness per documented physical examination, despite being on immunosuppressive medications and that Plaintiff's Prednisone dosage had recently been increased. (AR 103). Dr. Borigini explained that Sjogren's is a systemic inflammatory condition which causes significant stiffness, which is documented in Plaintiff's medical file. (AR 103). After reviewing Plaintiff's medical record, Dr. Borigini found that "[b]ased on the documentation, it does reveal a functional impairment however, it would not preclude the claimant from engaging in any compensable employment for a minimum of twenty-five hours per week as long as he is allowed to get up and stretch every 15 minutes." (AR 103). Plaintiff argues that Dr. Borigini's opinion was based on flawed and incomplete record review. (Doc. 79 p. 14). However, the fact that Plaintiff submitted more medical evidence in support of his claim after Dr. Borigini's gave his opinion is not the type of "procedural unreasonableness" that renders the BRC's reliance on his Dr. Borigini's opinion arbitrary and capricious. *See Howard*, 929 F.Supp.2d at 1297 (finding that the fact that the reviewing health care providers may not have received every treating physician's report or reported inconsistent dates of office visits is not the type of irregularity that creates "procedural unreasonableness" sufficient to recast the plan administrator's reliance upon the consulting professionals' opinions as being arbitrary

and capricious).  Accordingly, the Court finds that the BRC's reliance on Dr. Borigini's opinion does not render its decision to deny Plaintiff LTD benefits arbitrary and capricious.

As to Dr. Weinstein, her Physician Review shows that she conducted a thorough chronological review of Plaintiff's medical documentation, ultimately concluding that Plaintiff's conditions fail to support a functional impairment because "none of the clinical information from treating providers documents significantly abnormal physical examination findings that would support functional impairments from sedentary work for 25 hours per week." (AR 104-107). Contrary to Plaintiff's arguments, the Court finds that the BRC's reliance on Dr. Weinstein's opinion does not render the BRC's decision arbitrary and capricious.  Plaintiff argues that Dr. Weinstein "cherry-picked" Plaintiff's medical records and only considered Plaintiff's medical conditions in isolation, which is inappropriate and arbitrary, as is FedEx's reliance on such an opinion. (Doc. 79 p. 16, 18).  However, a review of Dr. Weinstein's four-page, single-spaced opinion does not reveal that she "cherry-picked" Plaintiff's record, but rather that she carefully reviewed treatment records from Drs. Cohen, Brzezinski, and Kowal; the opinion letters of Drs. Cohen and Brzezinski; and the treatment notes and radiographic evaluation of Dr. Haight. (AR 104-105).  Plaintiff takes issue with Dr. Weinstein's treatment of Dr. Haight's records, which Plaintiff alleges provide "an overwhelming amount of extremely disabling conditions." (Doc. 79 p. 17).  In her opinion, Dr. Weinstein noted that "[t]he chiropractor records indicate that the claimant had diffuse pain and he was treated with manipulation and modalities," thus indicating that she considered Dr. Haight's findings in reaching her own conclusion as to whether Plaintiff met the definition of Total Disability. (AR 106).  As noted above, the fact that an administrator relies on the opinion of a consultant does not render the decision arbitrary and capricious. *Howard*, 929 F.Supp.2d at 1297.

Furthermore, the Court does not find that the BRC's decision was arbitrary and capricious because, as Plaintiff argues, FedEx failed to seek out any updated information during the pendency of its review of Plaintiff, even though later dated medical records indicated Plaintiff was receiving treatment for scleraderma, spina bifida occulta, and multiple sclerosis. (Doc. 79 p. 18).  As the plain language of the LTD Plan makes clear, "[t]he burden of proof for establishing a disability is on the Covered Employee." (AR 315).  Thus, it was Plaintiff's burden to produce medical evidence sufficient to establish a Total Disability.  The only mention of scleraderma, spina bifida occulta, and multiple sclerosis in the Administrative Record is a passing reference in Dr. Haight's review of Plaintiff's medical history. (AR 50).  Plaintiff simply failed to produce any medical evidence showing that scleraderma, spina bifida occulta, and multiple sclerosis precluded him from meeting the definition of Total Disability.  Accordingly, the BRC's decision was not rendered arbitrary and capricious by its failure to obtain updated information regarding these conditions.

### c)  Whether FedEx was operating under a conflict of interest and whether this conflict renders its decision arbitrary and capricious

The only remaining analysis is to determine whether FedEx had a conflict of interest that tainted its decision. *Blankenship,* 644 F.3d at 1350.  If there is no conflict, then the inquiry ends and the decision is affirmed. *Id.*  If there is a conflict of interest, the Court must consider the conflict as one factor to be considered in determining the reasonableness of the administrator's decision. *See Meadows v. American Airlines,* 2011 WL 1102774, at *21 (S.D. Fla. Mar. 24, 2011) (quoting *Miller v. Prudential Ins. Co. of Am.,* 625 F.Supp.2d 1256, 1264 (S.D. Fla. 2008) ("If the benefit plan gives discretion to an administrator who is operating under a conflict of interest, the conflict is to be weighed as "a factor' in determining whether there is an abuse of

discretion . . .with the burden of proof remaining on the claimant to show that the administrator acted arbitrarily.")).

Under Eleventh Circuit case law, no conflict of interest exists where plan benefits are paid out of a trust fund by periodic and non-reversionary payments by an employer. *See Townsend v. Delta Family—Care Disability & Survivorship Plan,* 295 F.App'x 971, 975-76 (11th Cir. 2008); *Gilley v. Monsanto Co., Inc.,* 490 F.3d 848, 856-57 (11th Cir. 2007); *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir. 1997).  However, after the Supreme Court's opinion in *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008), some courts have interpreted the Supreme Court to require a broader view of the existence of a structural conflict of interest. *Meadows,* 2011 WL 1102774, at *21. This is because that "[e]ven in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation." *Miller v. American Airlines, Inc.,* 632 F.3d 837, 847 (3rd Cir. 2011).  Nevertheless, the Supreme Court did recognize in *Glenn* that a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Glenn,* 554 U.S. at 117.

Here, even if the Court determines that there is a structural conflict of interest, FedEx has taken steps to diminish any potential conflict of interest.  The LTD Plan provides that FedEx has established and maintains a trust fund "for the purposes of paying benefits under the Plan." (AR 314).  Contributions to the LTD Plan by FedEx are irrevocable and can never inure to the benefit of FedEx. (AR 314).  Given these steps taken by FedEx, any potential structural conflict of interest would weigh only slightly in favor of Plaintiff.  "[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to provide its decision was not

tainted by self-interest." *Doyle,* 542 F.3d 1360.  Plaintiff has failed to carry this burden and, thus, the Court finds that any potential conflict of interest does not render the decision to deny Plaintiff LTD benefits arbitrary and capricious.

### V.        Conclusion

After a review of the Administrative Record, the Court finds that the decision to deny Plaintiff LTD benefits was *de novo* wrong and arbitrary and capricious.  Accordingly,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

1)  Defendant Aetna Life Insurance Company be dismissed from the case;

2)  Defendants' Motion for Summary Judgment (Doc. 78) be **GRANTED**;

3)  Plaintiff's Dispositive Motion for Summary Judgment (Doc. 79) be **DENIED**; and

4)  Plaintiff's sealed Dispositive Motion for Summary Judgment (Doc. 84) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on April 28, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02
Copies furnished to:

Counsel of Record
Unrepresented Parties